## Commonwealth ex rel. Lafflin *versus* Christopher.

The sheriff of Philadelphia has the custody of the debtors' and witnesses' apartment of the Philadelphia prison, and the appointment of its keeper.

At NISI PRIUS.

Suggestion for a *quo warranto*.

William Lafflin suggests that Samuel Allen, Esq., was duly elected high sheriff of the city and county of Philadelphia on the second Tuesday of October, 1852, and that said Allen

[Commonwealth ex rel. Lafflin *v.* Christopher.]

appointed one Jesse Christopher keeper of the debtors' apartment of the Philadelphia County prison, and that said Christopher gave the proper security and acted as the deputy of the said Allen until some time in 1855, when he was appointed to the same office by the inspectors of the Philadelphia County prison, and, under said appointment, now usurps said office.

And further, that on the second Tuesday of October, 1855, George Magee was duly elected sheriff of said county, and duly qualified, &c., and entered upon the duties of his office. That he then appointed the relator, William Lafflin, keeper of the debtors' apartment of the said Philadelphia prison; that the said Lafflin demanded of the said Christopher to have the custody of the said debtors' apartment and to enter upon his duties as keeper thereof, he having first entered into the proper security, and that said Christopher refused to deliver to him the custody of the said debtors' apartment, and prayer for process to said Jesse Christopher to answer by what warrant he claimed to have and enjoy the franchise of said office.

Defendant moved to quash the writ on the ground that it alleged no title to the office. January 21, 1856, the court overruled the motion to quash.

LEWIS, C. J.—The questions arising in this cause ought to be carefully considered and decided on a final hearing. We see no peculiar hardship in requiring the defendant to present his defence in the usual way. He is in possession, and can suffer no serious injury from the delay of a few weeks. His motion to quash the writ is therefore overruled.

WOODWARD, J.—I dissent on the ground that the relator alleges no title whatever to the office, and therefore I would quash his writ.

Respondent then pleaded several pleas, to the third of which relator demurred, and replied to the fourth.

These pleadings raised the question for determination so clearly stated in the opinion.

*R. Vaux* and *W. L. Hirst,* for relator.

*F. C. Brewster* and *J. A. Simpson,* for respondent.

The opinion of the court was delivered February 21st, 1856, by

LOWRIE, J.—This case depends entirely upon the answer to the question, Who has the custody of the debtors' and witnesses' committed to the prison in the city of Philadelphia? I have had considerable difficulty in finding the answer, because it is to be derived from the history of the Philadelphia prison, which is rather involved than expressed in very many acts of

[Commonwealth ex rel. Lafflin v. Christopher.]

assembly evidently prepared in Philadelphia where the existing state of things, at different periods, were too well known to be carefully expressed.

As far back as 1790, 2 Smith's Laws, 534, it appears that the prison consisted of a gaol and a house of correction; and the gaol (on Walnut Street) was ordered to be provided with cells, for the punishment of hardened and atrocious offenders from all parts of the State, still leaving part of it for lesser offenders and persons charged as criminals; and the mayor and two aldermen, and two justices of the peace were to appoint its keeper, and fix his compensation. The then house of correction (on Prune Street) was at the same time ordered to be fitted up for debtors and witnesses, and to be called "the debtors' apartment."

The act of 23d September, 1791, 3 Smith's Laws, 44, authorizes the mayor, two aldermen, and two justices to appoint inspectors of the *prison*, and also a keeper, and the inspectors to make rules for the government of the *convicts*. This refers to the same portion of the prison that is called the gaol in the act of 1790, and the gaol and penitentiary house in many subsequent acts (see 3 Sm. 186; 4 id. 156–334–393; acts of 30th March, 1831, §§ 4 and 14; April, 1835, § 18).

By the act of 4th April, 1792, 3 Sm. 78, the power of the inspectors of the *gaol* is extended to making rules and regulations for the debtors' apartment, and the oversight of its management, and of the conduct of its keeper, and his salary is fixed at $500, payable by the county.

The act of 18th April, 1795, 3 Sm. 246, requires the inspectors of the *gaol* to provide necessaries for all persons confined in it, and authorizes them to appoint the keeper and fix his compensation. Keeping in mind the distinction between the gaol and the debtors' apartment, we easily understand that this act does not relate to the latter nor interfere with the province of the sheriff as its keeper. And we are confirmed in this by the act of 13th April, 1799, 3 Sm. 379, which shows that the sheriff then had the lawful custody of the debtors' apartment, and the inspectors of the gaol.

The act of 2d April, 1803, 4 Sm. 87, provides for what was afterwards called the Arch Street prison (as in the acts of 27th February, 1833, P. L. 56, and 6th February, 1834, P. L. 33), intended for the confinement of persons awaiting their trial, and for persons committed on short sentences.

The act of 13th March, 1816, 6 Sm. 345, authorizes a new debtors' apartment to be provided by the county commissioners, not the inspectors, in the Arch Street prison, and the fitting up of the old debtors' apartment in Prune Street, by the

inspectors as a house of correction for petty offences and untried prisoners.

The new county prison and debtors' apartment in Moyamensing were provided for by the act of 30th March, 1831, P. L. 228. And in this act and in those of 27th February, 1833; 6th February, 1834, and 22d March, 1836, P. L. 173, the distinction between them is still kept up, and in the last-named act a "vagrants' apartment" is provided for, to be under the care of the inspectors.

Section 1st of the act of 1831, provides for a prison for criminals, and section 6 for a debtors' apartment, so distinct that it might be in a different part of the county, and was to be paid out of different funds. If they had been so built, this controversy could hardly have arisen. There is, however, a complete separation between them, though they are on the same lot. Section 7 distinguishes "the county prison and debtors' apartment," and requires the inspectors to remove the convicts to "the new prison" from the old one; and "the officers who have them in charge," to remove the debtors and persons confined as witnesses, to "the debtors' apartment."

This sketch of the acts of assembly shows plainly enough that the act of 14th April, 1835, P. L. 232, may refer only to what is called "the new prison," in the acts of 1831, 1833, 1834, and 1836, and not at all to what is called the debtors' apartment in the same and other acts, though it was constructed by the same commissioners. This probability is strengthened by the fact that none of the provisions of the act of 1835 have any special reference to the debtors' apartment, and none of them seem to be applicable to it. Even the fact that it is a supplement to the act of 1831, is some evidence that the prior general arrangements were not intended to be changed.

It is still stronger evidence of it, that the officers to whom the execution of the laws of 1831 and 1835 was committed, have, up to this time, understood that the debtors' apartment is a different institution from the county prison, and subject to a different control. The history of these prisons, necessarily entered into and guided the earlier interpretation of the laws, and it is the forgetfulness of this history, and the disregard of contemporaneous interpretation that has led to the present difficulty. There is even subsequent legislation in the act of 22d March, 1836, wherein the distinction is preserved; and this might have been a warning against the new construction now attempted to be attached to the act of 1835. If the act of 1792 had been read in the same way, that is, without reference to the state of the law when it was passed, this dispute might have been raised sixty years since.

There is still another reason why we must presume that the

sheriff has the custody of the debtors' apartment.   By the very form and substance of numerous writs and orders, many persons are committed to his keeping for various purposes, and he gives security for the faithful performance of this duty. Now we find no law requiring a change of these writs and orders, or imposing those duties upon other officers, and no law providing that any other officer shall give the corresponding security; and the rule is imperative that we cannot interpret the law of 1835 so as to make it so totally different from the general law of the State, and produce such radical changes, unless it is plain that such was its intention.

As at present advised, it seems very clear to me that the sheriff, and not the inspectors, has the custody of the debtors' apartment, and the appointment of its keeper, and I discover no such former judgment as prevents me from so deciding.

For these reasons the plaintiff is entitled to judgment on the demurrer to the third plea, and on the replication to the fourth.

                                        Judgment for plaintiff.